J-S08030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1529 MDA 2021 |

Appeal from the Order Entered October 22, 2021
In the Court of Common Pleas of Mifflin County
Orphans' Court at No(s):  2021-00022

| | | |
|---|---|---|
| IN RE: C.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1530 MDA 2021 |

Appeal from the Order Entered October 22, 2021
In the Court of Common Pleas of Mifflin County
Orphans' Court at No(s):  2021-00023

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.: **FILED: MAY 16, 2022**

In these consolidated appeals, K.C. (Mother) appeals from the October 22, 2021 orders involuntarily terminating her parental rights to her sons, C.C.

a/k/a Ch.C. (born September 2013) and C.C. a/k/a Ca.C. (born August 2015) (collectively, the Children).[1] We affirm.

The facts underlying these appeals involve the Children's long-term sexual abuse and exploitation by their biological father, C.C., Jr. (Father), during their formative years, which has resulted in trauma.[2] This case began in 2018, when Mother reported to Mifflin County Children and Youth Social Services Agency (Agency) that she discovered child pornography on Father's phone, and that Father stated he put his mouth on one of the Children's penises.[3] N.T., 9/23/21, at 385; Orphans' Ct. Op., 10/22/21, at 3, n. 3. The Agency then provided in-home services for Mother and the Children from September 17, 2018, to December 26, 2018, when the Agency closed the case because (1) Mother stated she would not allow the Children to be around Father; (2) Mother was participating with service providers; and (3) the Children were receiving ongoing trauma therapy from Kristen Hennessy, Ph.D. N.T., 9/22/21, at 100.

_____

[1] On December 17, 2021, this Court consolidated Mother's appeals *sua sponte* pursuant to Pa.R.A.P. 513 and 2138.

[2] The orphans' court also terminated Father's parental rights to the Children. However, Father did not appeal.

[3] On August 23, 2018, Father was indicated as a perpetrator by commission for causing sexual abuse or exploitation of the Children. N.T., 9/22/21, at 105; Petitioner's Exhibit 6. Specifically, Ch.C., the older child, then nearly age five, disclosed that Father would make him put his mouth on Ca.C.'s "dinky," and Father would watch, and Father would put his mouth on Ch.C.'s "dinky." *Id.*

However, on January 26, 2019, the Agency received a referral alleging Mother had allowed Father to stay in her home overnight, when the Children were present, which Mother did not dispute. N.T., 9/22/21, at 100, 389. The Children were then three and five years old. The Agency was granted custody of the Children on or about January 29, 2019. The Agency was particularly concerned about Mother's mental health, housing and income, her inability to protect the Children, unwillingness to participate with service providers and accept feedback, and her ability to appropriately respond to the Children's behaviors caused by past trauma. *Id.* at 104.

Because Mother allowed Father around the Children, she was indicated as a perpetrator by omission on October 15, 2019. *Id.* at 105-106. Specifically, Mother was indicated as a perpetrator for causing sexual abuse or exploitation of a child through any act or failure to act and creating a likelihood of sexual abuse or exploitation of a child. *Id.*

On February 11, 2019, following a hearing, the Children were adjudicated dependent. Mother was granted supervised visitation with the Children, and Father's visitation was suspended.

The Agency prepared permanency plans with reunification as the Children's goal, between February 2019, to February 2021. *Id.* at 102. Mother's objectives under the permanency plans required, in part, that she

> ensure that the emotional, physical, medical, and educational needs of the [C]hildren are met. She will meet the [C]hildren's

- 3 -

mental health needs. She will demonstrate protective capacities[4] of the [C]hildren. She will ensure her own mental health needs are met. She will obtain and maintain stable housing and income, and she will cooperate with the Agency and other service providers.

*Id.* at 107. Five permanency review hearings were held, all of which resulted in permanency orders finding that Mother had made minimal progress in her permanency goals. *Id.* at 103-104.

In August 2020, Child Protective Services opened an investigation of Mother due to Ca.C. alleging that she, *inter alia*, "was exposing herself for sexual gratification by asking [him] to touch" her. *Id.* at 106. Mother's visits with the Children were suspended temporarily during the investigation. *Id.* at 23.

The orphans' court noted that on October 9, 2020, Mother was found to be an indicated perpetrator of abuse by commission with respect to Ca.C. *Id.* at 106; Orphans' Ct. Op., 10/22/21, at 2, n.2. On October 19, 2020, the Agency filed a petition to temporarily suspend visitation based on the opinion of the Children's trauma therapist that it was in their best interest for Mother's visits to remain suspended. N.T., 9/22/21, at 32. The court granted the Agency's petition on October 20, 2020. Based on the foregoing, Mother's last visit with the Children was in August 2020. *Id.* at 223.

_____

[4] The Children's trauma therapist described "protective capacity" as Mother's ability to understand that the Children "were terribly traumatized by their father . . . and that she was never going to put them in a situation like that again. . . ." N.T., 9/22/21, at 89.

- 4 -

On May 17, 2021, the Agency filed petitions for the involuntary termination of Mother's and Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  On July 20, 2021, the orphans' court appointed Erica J. Shoaf, Esquire, as the Children's legal counsel, and Robert M. Covell, Esquire, as the Children's guardian *ad litem* (GAL).

The evidentiary hearing occurred on September 22 and 23, 2021.[5, 6] The Agency presented the testimony of Kristen Hennessy, Ph.D., a licensed psychologist and expert in child trauma therapy; Brenda Dobson, the Agency placement caseworker; Darlene Griffith, a family counselor at Family Intervention Crisis Services (FICS); and David G. Ray, M.Ed., a licensed psychologist.  The Agency also introduced twelve exhibits, which the orphans' court admitted into evidence.  Mother, who was represented by counsel, testified on her own behalf, and she presented no other witnesses.

The record reveals that Dr. Hennessy commenced trauma therapy in separate sessions with the Children in October 2018, when they were then

---

[5] The certified record includes two separately bound transcripts dated "Wednesday, September 22, 2021, 8:30 a.m."  One transcript is identified as "Volume I of II," and the other as "Volume II of II."  However, the latter represents the testimony received by the orphans' court on September 23, 2021, and we refer to this transcript by that date.

[6] Father did not appear for the hearing.  Upon agreement of the parties' counsel, the orphans' court dismissed Father's attorney at the beginning of the hearing after he explained that Father had not participated in any of the dependency proceedings and had failed to respond to his outreach throughout the case.  N.T., 9/22/21, at 4-7.

three and five years old and in Mother's custody. N.T., 9/22/21, at 10-11, 15. Mother and the Agency reported to Dr. Hennessy that the Children were, *inter alia*, "masturbating compulsively, including in their feces; they were acting out sexually with one another; and that [Ch.C.] was exhibiting a lot of tantrum behaviors reporting that he was hearing the voice of his parents; and that [Ca.C.] was also inserting items into his rectum frequently." *Id.* at 10-11. In addition, Dr. Hennessy learned that the Children had witnessed domestic violence between Mother and Father. *Id.* at 11.

Dr. Hennessy diagnosed the Children with Post-traumatic Stress Disorder (PTSD) due to the degree that they were "sexualized and traumatized." *Id.* at 15-16, 19. She testified that the Children presented a behavioral pattern of "fight, flight, [and] freeze." *Id.* at 22. During approximately eighteen months that Children had visitation with Mother, Dr. Hennessy testified that they made "very slow" progress, and they "were moving [in and out of] foster homes a lot."[7] *Id.* She specified that Ca.C., the younger child, verbalized fear of Mother, and Ch.C. would have temper tantrums "the whole night before" a scheduled visit with Mother. *Id.* at 22-23. Dr. Hennessy explained that Ch.C.'s tantrums included breaking things

---

[7] At the time of the hearing, Ch.C. was in his fourth foster placement, and Ca.C. was in his fifth placement. N.T., 9/22/21, at 45. The Children had resided in the same foster homes until August 2020, when Ca.C. was placed in a new foster home. *Id.* at 125, 198. Dr. Hennessey recommended separating the Children because they triggered each other's sexualized behavior. *Id.* at 85-87.

and hurting people. *Id.* at 47. In one tantrum, Ch.C. caused an unidentified caseworker to suffer a concussion. *Id.* at 48.

After FICS stopped Mother's visitations with Children in August 2020, Dr. Hennessy testified that the Children made "very significant progress." *Id.* at 34, 48. She opined that, at present, Ca.C. "is really thriving. He is doing quite well. He still has symptoms . . . but he understands sexual boundaries." *Id.* at 34. Dr. Hennessy stated that Ch.C. "has made very significant progress [, but] [h]e is still a little bit behind where [Ca.C.] is." *Id.* at 35. For example, she explained that Ch.C. is "far less sexualized," and his tantrums are less frequent and less severe. *Id.* However, he is fearful of upsetting Mother, which Dr. Hennessy described as a "loyalty conflict." *Id.*

Darlene Griffith, the family counselor at FICS, commenced services specifically for Mother in March 2019, which continued through the time of the hearing, including, but not limited to, (1) counseling sessions that focused on Mother's mental health, and (2) parenting education sessions that focused on learning the Children's therapeutic needs. N.T., 9/22/21, at 153-156. Ms. Griffith and Mother participated in monthly telephone conferences with Dr. Hennessy about the Children's therapeutic needs as related to her parenting. *Id.* at 20, 157, 180. Ms. Griffith provided a visitation plan to Mother, that included written expectations and/or recommendations for parenting the Children, all of which were provided by Dr. Hennessy and discussed during the monthly telephone conferences. *Id.* at 166-167.

From September until November 2019, Mother followed the visitation plan and implemented the recommendations, and, according to Ms. Griffith, "we saw a significant change in visits for the better." *Id.* at 168-170. In addition, Mother was attending the Children's appointments with Dr. Hennessy, to which Ms. Griffith accompanied Mother. *Id.* at 171. In December 2019, FICS permitted the Children to attend visitation together with Mother, and it increased the visits from two to four hours per week, one hour of which was permitted in Mother's home. *Id.* at 170-171. However, Ms. Griffith testified that Mother soon regressed by "really struggl[ing] with following the recommendations." *Id.* at 171, 178. The Children's behavior, in turn, also regressed. *Id.* at 171-172.

The testimony of Ms. Griffith, Dr. Hennessy, and Ms. Dobson, the Agency caseworker, revealed that Mother regressed in her parenting by disagreeing that the Children's behavioral problems were the result of being profoundly traumatized. *Id.* at 93-94, 111-115, 171, 224. In fact, Ms. Dobson testified that Mother "has stated multiple times that her kids were not hurt or put in harm while in her care. . . ." *Id.* at 115. Dr. Hennessy explained that Mother originally understood that the Children suffered trauma from sexual abuse, but she has gone "back and forth." *Id.* at 93. Therefore, "she has not consistently provided the [C]hildren with what they need. . . ." *Id.* at 93-94. Specifically, Dr. Hennessy testified that Mother has never provided the Children with the ability "to feel safe" and with "trauma-informed

parenting, meaning . . . attuned to [their] emotional needs and able and willing to respond to [their] emotional needs." *Id.* at 32-33.

David G. Ray, M.Ed., a licensed psychologist, was referred by the Agency to evaluate Mother's psychological functioning and to perform a bonding assessment. In the testing that he administered, Mother scored in the superior range of intelligence. N.T., 9/23/21, at 247. However, Mother has a long history of mental illness, and psychologist, David Ray, agreed with her present diagnoses of bipolar disorder, attention deficit disorder, and PTSD. *Id.* at 260, 276. In addition, Mr. Ray stated that Mother has "dependent personality traits," which affect her judgment in romantic relationships. *Id.* at 276. Mr. Ray opined, "when I look at all of her own mental health issues, she can't provide what . . . the [C]hildren need to recover from their horrific trauma." *Id.* at 280. He further opined that the Children have a "disorganized attachment" to Mother, the effect of which destabilizes them. *Id.* at 288-289.

On October 22, 2021, the orphans' court issued orders terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b) and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b). Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) statement on December 20, 2021.

On appeal, Mother presents the following issue for review:

Mother and the reunification caseworker had a highly contentious, counterproductive relationship during the pendency of this case.

- 9 -

Did the trial court err when it found that the Agency provided by clear and convincing evidence that Mother's parental incapacity cannot or will not be remedied and that termination was in the [C]hildren's best interest when the Agency permitted open conflict and hostility between the assigned caseworker and Mother which negated any efforts to enable reunification with the [C]hildren?

Mother's Brief at 3.

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. If the orphans' court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, then the orphans' court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71

- 10 -

A.3d 251, 267 (Pa. 2013). When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. ***In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted).

Instantly, we analyze the orders pursuant to Section 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct and may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). We also note that a parent is "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *In re S.C.*, 247 A.3d at 1105 (citation omitted).

With respect to Section 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268.

The **T.S.M.** Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **Id.** at 269. The **T.S.M.** Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

### Mother's Claim That Agency Obstructed Her Progress

In her sole issue on appeal, Mother claims that the Agency obstructed her progress "in learning how to parent her traumatized children." Mother's Brief at 6. Specifically, Mother contends that the Agency "permitted and fostered open conflict and hostility between Mother and the assigned reunification caseworker, negating any effort to enable reunification with" the Children. **Id.** Mother submits that the orphans' court abused its discretion by dismissing "the effect of the reunification caseworker's antagonistic behavior" on her reunification efforts. **Id.** at 12. Mother argues that the Agency obstructed her progress and, therefore, the orphans' court's conclusion that her parental incapacity cannot or will not be remedied is not supported by the record. **Id.** at 16. As such, Mother's argument implicates the final element

of Section 2511(a)(2).[8] After review, we conclude that Mother's argument merits no relief as it is not supported by the record.

Although Mother does not name the reunification caseworker with whom she "had a highly contentious, counterproductive relationship during the pendency of this case," in its opinion accompanying the subject orders, the orphans' court found that Mother had a high level of conflict with Ms. Griffith, the FICS caseworker, who, in turn, had a contentious relationship with Lori Rocco, Mother's individual therapist. Orphans' Ct. Op., 10/22/21, at 5, n. 4; Mother's Brief at 3. The orphans' court found:

> FICS caseworker Ms. Griffith was asked by Mother to remove herself from the case as Mother believed that Ms. Griffith was actively working against her. Additionally, it was alleged by Mother and testified by Ms. Griffith, that Mother once overbooked herself with a therapy session with Lori Rocco and Ms. Griffith, and Ms. Griffith allegedly forced Mother to terminate Mother's therapy session or risk a negative assessment for Mother's permanency review. Lori Rocco made several complaints to Ms. Griffith's supervisor over this issue and asked that Ms. Griffith not to be involved in the case as well. Mother maintains that Ms. Griffith actively works to make Mother lose parental rights to her children and [Mother] focused heavily on that conflict during [her] testimony. Ms. Griffith denies that she ever forced Mother to terminate a therapy session, and she did not see a reason to

_____

[8] Because Mother's sole argument is that her incapacity was caused by conflict with her reunification team, she has waived on appeal any claim regarding the first two elements of Section 2511(a)(2), as well as any claim with respect to Section 2511(b). **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's Statement of Questions Involved is deemed waived); **see also In re M.Z.T.M.W.**, 163 A.3d 462, 465-66 (Pa. Super. 2017) (explaining this Court will not review an appellant's claim unless it is included in the statement of questions involved, developed in his or her argument, and supported by citation to relevant legal authority).

remove herself from this case. Neither Lori Rocco, nor Ms. Griffith's supervisor[,] testified [in this case].

Orphans' Ct. Op., 10/22/21, at 5, n. 4.[9]

_____

[9] By way of background, Ms. Griffith testified that, in May 2020, she scheduled Mother's monthly telephone conference with Dr. Hennessey, and in addition to Ms. Griffith, it was to include Ms. Dobson, the Agency caseworker. N.T., 9/22/21, at 180. Ms. Griffith testified that she confirmed the time with Mother, and when the time for the conference arrived, Mother was in a telephone counseling session with her therapist, Lori Rocco. *Id.* at 181. Ms. Griffith explained, "So I asked [Mother] what she wants to do. . . . She indicated that she would end the phone call with her therapist and that she would participate in the phone call with myself, [Ms. Dobson], and [Dr. Hennessey] because her boys were more important, and I said okay." *Id.* Ms. Griffith testified, "It was Lori's belief that I made [Mother] discontinue her therapy to attend a phone call and ever since then it has not been a very great relationship with Lori [Rocco]." *Id.* at 181-182. On cross-examination by Mother's counsel, Ms. Griffith explained that Mother "miscommunicated" to Ms. Rocco how and why she ended her counseling session that day. *Id.* at 192. Ms. Griffith testified that Ms. Rocco "continues to be very angry. . . . I would say it's [Mother's] therapist [who] is holding on to the grudge." *Id.*

Mr. Ray, the licensed psychologist who evaluated Mother, testified on cross-examination by Mother's counsel that he did not find unusual the animosity between Lori Rocco and Ms. Griffith. N.T., 9/23/21, at 300. He explained that "therapists can form close relationships with their clients. . . . They are very invested in what is happening in their life and so on and so forth. . . . Therapists can get very frustrated when they are like why doesn't Children and Youth ask me my opinion before they say mom can't have visits with the kids? Why don't you come to me? I meet this person every week. I know this mother. And that sets the stage for animosity." *Id.* at 300-301. Importantly, Mr. Ray testified:

> Q. What is the effect on [Mother] that she has one professional fighting with another one of the professionals and both of them are . . . reportedly trying to help her?

*(Footnote Continued Next Page)*

Mother described her relationship with Ms. Griffith as "toxic." N.T., 9/23/21, at 368. She explained, "When you have a worker who says absolutely everything you say is just wrong and that her opinion is fact, you can't – there is no discussion or communication. There is no learning taking place and that became bad." *Id.* Mother provided an example that she described as "the swatting incident." *Id.* at 366. Mother testified that Ms. Griffith accused her of spanking Ch.C. while they were in Dr. Hennessey's office, and Mother initially denied striking Ch.C. *Id.* Mother stated, "And the next day I went up to [Ms. Griffith] and I was like, you know what? I'm sorry. That completely missed my notice. I know that's something we're not supposed to do. I'm sorry. Thank you for pointing that out to me." *Id.* Nevertheless, Mother testified, "that literally was the beginning of the end with my relationship with her." *Id.* at 367.

Ms. Griffith testified about the incident, as follows. On January 28, 2020, she and Mother attended the Children's therapy appointment with Dr. Hennessy. N.T., 9/22/21, at 173. At one point, Mother took Ch.C. to the hallway where there was a sink, and Ms. Griffith observed Mother tell Ch.C., "I told you to keep your fingers out of your nose, and she spanked him. This

---

A. Well, in my mind it has very little to nothing to do [with it] because they are doing two different jobs. I think that had a lot to do with [the disagreements between the professionals].

*Id.* at 301-302.

- 16 -

resulted in [Ch.C.] hitting Mother three to four times before being called back to therapy." *Id.* Ms. Griffith also explained that Mother:

> threatened spanking [the Children] in visits and . . . she had been educated that physical discipline is not recommended for these children specifically because they are trauma children. And so, again, this was right around when we thought we were seeing progress. This kind of just really solidified the regression that we saw in [Mother].

*Id.* at 173-174.

In its Rule 1925(a) statement, the orphans' court noted that there is animosity between Mother and Ms. Griffith. Orphans' Ct. Rule 1925(a) Statement, 12/20/21, at 4 (unpaginated). However, the orphans' court disagreed "that this conflict in any way relates to the issue of termination, as the core issue of this termination is the extensive trauma the [C]hildren suffered, and Mother's inability to treat the [C]hildren's trauma." *Id.* at 5. The orphans' court concluded that it is "tenuous a[t] most, that the conflict [between Ms. Griffith and Mother] is the sole barrier stopping Mother from reunification with her children." *Id.* On this record, we agree with the orphans' court, and we discern no abuse of discretion in the orphans' court's conclusion.

Indeed, we have uncovered no evidence to support Mother's claims that her poor relationship with Ms. Griffith impacted her reunification efforts or that the Agency fostered any conflict. Dr. Hennessy testified, "it's common when parents have kids in care that there is some tension[,] and I have absolutely seen parents and teams work through that. . . . I think that is part of why a

psychological evaluation was done on [Mother] [by Mr. Ray] to kind of look at what is going on, what is going on that there's tension, and would that tension repeat if there was a new team, etc." N.T., 9/22/21, at 71. However, Dr. Hennessy did not testify that any animosity among the reunification team and Mother precluded Mother from meeting her parenting goals. *Id.* Dr. Hennessy explained:

> Q. What has been [M]other's focus throughout the dependency proceedings?
>
> A. So, my experience of [M]other's focus has been [on] trying to highlight team conflict instead of the [C]hildren's trauma. My experience has been that [Mother] has consistently tried to use the conversations with me to discount the [C]hildren's symptoms, **making it about something other than their trauma**, and to highlight . . . issues other than the well-being of the [C]hildren. [Mother] typically used those conversations to kind of change the narrative away from my understanding of the focus of the conversation[,] which is what do your children need? What is going on with your kids[,] and what do they need?

*Id.* at 92-93 (emphasis added). Mother stopped speaking voluntarily to Dr. Hennessy in approximately August of 2020, up through and including the time of the termination hearing. *Id.* at 60. Mother acknowledged that she stopped speaking to Dr. Hennessy and stated, "What ended the phone calls with Kristen Hennessy [was that] I was informed of the investigation against me [based on Ca.C.'s allegations of sexual abuse]." *Id.* at 372.

Mr. Ray testified extensively about his psychological evaluation of Mother. He stated, "Sadly, based on my evaluation . . . it is my opinion that [M]other still lacks the parental capacity to deal with these two severely

traumatized children." N.T., 9/23/21, at 280. Mr. Ray attributes Mother's incapacity to her "mental health issues." *Id.* He did not believe that Mother's animosity toward Ms. Griffith was the reason that Mother failed to meet her parenting goals. *Id.* at 301-302. Moreover, Mr. Ray opined that no additional services could remedy Mother's parental incapacity. *Id.* at 280-281.

On this record, we discern no abuse of discretion in the orphans' court concluding that Mother's animosity toward Ms. Griffith was not an obstacle to Mother's reunification with the Children. Rather, as set forth above, the evidence demonstrates that Mother failed to follow Dr. Hennessy's parenting recommendations because Mother did not agree that the Children's behaviors were caused by the trauma they endured. Indeed, on cross-examination Mother testified that "some of" the Children's behaviors are caused by genetics, and not by trauma. N.T., 9/23/21, at 403. In addition, the testimony revealed that Mother was incapable of understanding what would trigger the Children's behavior and how situations can be traumatizing. *Id.* at 118.

For these reasons, we agree with the orphans' court. Mother cannot or will not remedy her repeated and continued incapacity to parent the Children through the trauma they endured. Mother's failure or refusal has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being since January 26, 2019. Accordingly, we conclude that the orphans' court did not abuse its discretion

when it terminated Mother's parental rights to the Children under Section 2511(a)(2).

Regarding Section 2511(b), we are constrained to conclude that Mother has not raised nor argued any issue in this regard. Indeed, Section 2511(b) is never mentioned in Mother's brief, and we conclude that the issue is waived. *See M.Z.T.M.W.*, 163 A.3d at 465-66 (providing that where an appellate brief fails to provide any argument on an issue, the claim will be deemed waived) (citation omitted). Moreover, we are not required to address Section 2511(b) *sua sponte* when the issue was waived. *Id.* at 466, n.3.

However, even if Mother had preserved a claim with respect to Section 2511(b), we would conclude that the evidence demonstrates that terminating Mother's parental rights would best serve the Children's developmental, physical, and emotional needs and welfare. *See T.S.M.*, 71 A.3d at 267; 23 Pa.C.S. § 2511(b). For the first time, the Children are now in pre-adoptive placements, and they have formed "secure attachments" with their respective foster parents. N.T., 9/22/21, at 59, 126. Mr. Ray testified that the Children "need a sense of permanency." N.T., 9/23/21, at 321. He opined that it would be "a disaster" to remove the Children from their foster parents with whom they have a secure attachment "because these kids are . . . extremely frail." *Id.* at 326. Accordingly, even if Mother had preserved a challenge under Section 2511(b), we would discern no abuse of discretion and find no basis upon which to disturb the orphans' court's orders.

For the reasons set forth above, we conclude that Mother is due no relief.

Therefore, we affirm the orders terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/16/2022